# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**NORMA MALDONADO,**

        **Plaintiff,**

**v.**                                          **Case No:  6:12-cv-1552-Orl-36DAB**

**ALTA  HEALTHCARE  GROUP,  INC.**
**and ALBERT L. GREEN,**

        **Defendants.**

_____

### <u>ORDER</u>

This cause comes before the Court on the cross-motions for summary judgment filed by the parties in this matter.  Defendants Alta HealthCare Group, Inc. ("Alta") and Albert L. Green ("Green" and, collectively with Alta, "Defendants") filed a Motion for Summary Judgment ("Defendants' Motion") (Doc. 46), and Plaintiff Norma Maldonado ("Maldonado") filed a Motion for Partial Summary Judgment ("Maldonado's Motion") (Doc. 47).  Responses and replies to the motions for summary judgment were filed.  Docs. 53, 54, 59, 60.  Upon due consideration of the parties' submissions, including deposition transcripts, declarations, stipulated facts, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendants' Motion will be denied and Maldonado's Motion will be granted in part and denied in part.

I.     **BACKGROUND**

A.     **Statement of Facts[1]**

Green is the owner of Alta, a Florida corporation which, during the relevant time period, operated three assisted living facilities ("ALFs")—Aiden Springs Assisted Living Facility ("Aiden Springs"), Summit Care Assisted Living Facility ("Summit Care"),[2] and Alta Healthcare at Deerwood ("Deerwood").   Doc. 62, Stipulation of Material Facts Not in Dispute ("SOF") ¶¶ 1–2.[3]   The ALFs were licensed under Florida's Assisted Living Facilities Act, Fla. Stat. 429.01 *et seq.*, and were primarily engaged in providing services to the elderly.   SOF ¶ 5.   The services provided by the ALFs included:  assisting the residents with bathing, dressing, hygiene, and self-administration of medication;   performing housekeeping and laundry services;   providing companionship; and preparing meals.   *Id.* ¶ 6.

Florida regulations require ALFs to have at least one staff member certified in cardiopulmonary resuscitation ("CPR") on-site at all times.   *Id.* ¶ 8; *see* Fla. Admin. Code Ann. r. 58A-5.0191(4).   To comply with these regulations, Alta employed at least one individual as "Live-In Care Staff" at each of its ALFs.   *See* Doc. 47-2.   Members of the Live-In Care Staff were required to reside at the ALF, and to remain on the premises during the "night shift" from 8:00 p.m. to 8:00 a.m. each day.   *See id.*   The "Job Description & Responsibilities" (the "Job Description") for the Live-In Care Staff position states that "Live-in Staff are those who have chosen to reside on the premises and has an implicit value of $1,085 per month.  In exchange,

---

[1] The Court has determined the facts based on the parties' submissions, including stipulated facts, declarations, and deposition testimony.  Disputes concerning the facts are noted.

[2] In the ordinary course of their business, Defendants sometimes refer to the Summit Care facility as the "Juliana" facility, while also referring to the Deerwood facility as "Summit II".  Doc. 46-3, Deposition of Albert Green ("Green Dep.") 32:10–23.

[3] The Deerwood facility has since closed.  Green Dep. 68:4.

these staff have agreed to maintain an updated CPR certificate and assist a resident if an emergency arises during the night." *Id*. The Job Description further provides that "[t]he Live-In Staff is off duty during [the night shift] and in fact, is presumed to be asleep as the law allows. If the Live-In Staff decides to leave during the [night shift], they must inform the administrator in order that 24 hour CPR coverage can be maintained." *Id*. By contrast, during the "day shifts," Live-In Care Staff were expected to provide the care services ordinarily offered by the ALF to its elderly residents. *See id*.

During the relevant time period, from June 14, 2010 through the end of October 2010, Maldonado worked at Alta's Summit Care and Deerwood facilities as Live-In Care Staff. SOF ¶ 4.[4] Specifically, Maldonado worked at the Summit Care facility from June 14, 2010 through approximately October 24, 2010, at which point she transferred to the Deerwood facility, where she worked for about one week before resigning. *See* Doc. 46-2, Deposition of Norma Maldonado ("Maldonado Dep."), Ex. 6; Green Dep. 9:4–10, 89:23–25; Doc. 47-5.[5] Green hired Maldonado, set her rate of pay and schedule, and had the authority to discipline her. SOF ¶ 7.

For several weeks of her employment from June 14, 2010 through mid-October 2010, Maldonado was scheduled for a total of 45 hours during the "day shift" between 8:00 a.m. and 8:00 p.m. *Id.* ¶ 9.[6] For example, in at least one week, she was scheduled to work the day shift from 3:00 p.m. to 8:00 p.m. on Monday, from 12:00 p.m. to 8:00 p.m. on Tuesday and Wednesday, and from 8:00 a.m. to 8:00 p.m. on Thursday and Friday, for a total of 45 hours that

---

[4] Maldonado previously worked at Alta's Aiden Springs facility. SOF ¶ 3.

[5] Maldonado took a paid vacation from approximately October 16, 2010 through October 24, 2010, after which she began working at the Deerwood facility. *See* Green Dep. 88:25–89:11; Maldonado Dep. 188:4–20; Maldonado Dep., Exs. 6, 9.

[6] For the last week of October 2010, Maldonado was scheduled for 42 hours during the day shift. Green Dep. 89:23–90:17.

week.  *See* Doc. 47-4.  However, as a member of the Live-In Care Staff, she was also scheduled night shifts each day of the week, from 8:00 p.m. to 8:00 a.m., for a total of 84 hours on the night shift per week.  SOF ¶ 9.  During the night shifts, she was expected to sleep, but she was also expected to respond to any resident issues that arose during the night.  Green Dep. 99:9–14.

On several occasions, Maldonado's sleep during the night shift was interrupted by the need to attend to various issues at the ALF, such as residents who were wandering around the facility or having some type of medical issue.  Doc. 54-2, Declaration of Norma Maldonado ("Maldonado Dec.") ¶ 4.[7]  When Maldonado was required to respond to a resident issue during a night shift, she would take notes regarding the incident in "Resident Observation Logs," which are records maintained by Defendants in the ordinary course of business in accordance with Florida regulations.  Green Dep. 199:1–217:14, 245:3–9, 249:10–13; *see* Doc. 57; Fla. Admin. Code Ann. r. 58A-5.024(1)(d).  Maldonado would make the notations "as [soon] as possible [to] the moment" she performed the work, and otherwise "later on in the day or later on at night." Maldonado Dep. 219:15–22.  At his deposition, Green testified that he did not recall reviewing the Resident Observation Logs in 2010, that as a general matter he does not review the Resident Observation Logs, and that he had not reviewed them until preparing for his deposition.  Green Dep. 44:18–45:7, 194:19–196:6.

Maldonado testified that, on several occasions, she called Green to report an incident that occurred during the night shift, and her entries in the Resident Observation Logs reflect some of these calls.  Maldonado Dep. 83:3–86:22; *see* Doc. 57 at 9, 12, 16.  Maldonado further testified that, on several occasions, Green reported to the scene of the incident in response to her calls.

---

[7] Maldonado also claims that on other occasions during night shifts, she performed tasks such as doing laundry, cleaning, assisting the residents in preparing for bed, preparing for breakfast, and assisting the residents in getting ready in the morning.  Maldonado Dec. ¶ 4.

Maldonado Dep. 85:3–10.  Green, however, testified that he cannot recall receiving a phone call

from Maldonado or reporting to an ALF in response to a resident issue during any night shifts.

Green Dep. 109:7–110:15, 111:14–16.

Maldonado was compensated at a rate of $10.00 per hour for her day shift hours up to 40

per week, and at an overtime rate of $15.00 per hour for any day shift hours over 40 per week.

SOF ¶ 10.  Pursuant to an agreement with Maldonado, which was apparently based on a copy of

the Job Description signed by Maldonado as well as certain understandings between Defendants

and Maldonado (the "Live-In Agreement"),[8] Defendants did not provide monetary compensation

to Maldonado for her presence during scheduled night shifts or for time she actually spent

responding to residents' concerns during night shifts.  Green Dep. 100:23–101:11, 235:3–14; *see*

Doc. 47-2.  Green testified that Live-In Care Staff did not receive such compensation because

they benefited from the "implicit value" of not having to pay living expenses, which he

calculated to be worth $1,085.  Green Dep. 150:13–152:14.  When asked at his deposition

whether the Live-In Agreement contemplated Maldonado being compensated for work actually

performed during night shifts, Green testified:  "Our agreement was that she was—she lived

there, she was expected to be asleep at night, if there was an emergency that arose, she would

call me.  I would give her instructions from there.  And so that's what the agreement was."  *Id.* at

235:3–14.  Green further testified that if Maldonado was required to attend to matters in the

middle of the night, such matters were "minor" and "incidental", and therefore not compensable

---

[8] Maldonado disputes that any such agreement exists, but she assumes its existence for purposes of the motions for summary judgment.  Doc. 47 at 4 n.2.  The Live-In Agreement apparently included a one-page document, also signed by Maldonado, which broke down the $1,085 "implicit value" of the Live-In Care Staff position as follows:  room, $550; food, $250; utilities (lights & water), $75; cable, $50; local phone, $50; parking, $50; storage, $25; laundry, $35.  *See* Doc. 27-8 at 7.  The document does not indicate how Green determined these values, but Green testified that the values were based on his estimates of the value of each benefit provided to Maldonado.  *See* Green Dep. 155:14–167:1.

under the Live-In Agreement.  *Id.* at 101:5–11, 108:6–16.    Green testified that if Live-In Care Staff "were going to be actually doing work-related duties, which I can't see them doing in the middle of the night, then I would pay them for it if that was appropriate.  But my understanding is that this has already been covered in our agreement."  *Id.* at 100:23–101:3.  Green cannot recall ever paying Live-In Care Staff for work performed during night shifts.  *Id.* at 111:18–25.

The last three regular paychecks delivered to Maldonado were issued on October 18, October 25, and November 8, 2010, with the final paycheck corresponding to the one week Maldonado worked at the Deerwood facility before resigning.  *See* Doc. 47-5.[9]  As with her previous paychecks, none of these paychecks included compensation for night shifts.  *See id.*; Green Dep. 88:22–90:17.

Green testified that Alta does its "very best" to remain compliant with the Fair Labor Standards Act ("FLSA"), including by paying time-and-a-half for hours over 40 per week. Green Dep. 228:15–22.  Green acknowledged that Alta was sued for FLSA violations in 2008, but he stated that he did not recall the basis for the lawsuit.  *Id.* at 225:23–227:10.  In that case, the plaintiff alleged that Alta had violated the overtime and minimum wage provisions of the FLSA.  *See* Doc. 47-6.  There, Green was served with the complaint, signed a verified summary of the hours worked by the plaintiff, and signed a settlement agreement disposing of the case. *See* Doc. 47-7; Confidential Settlement Agreement and General Release, *Knight v. Alta HealthCare Group, Inc.*, No. 6:08-cv-703, Doc. 29, Ex. A (M.D. Fla. Mar. 10, 2009).  Green cannot recall whether Alta conducted any investigation or made any changes to its business in

---

[9] Maldonado was also issued a paycheck on November 1, 2010, apparently for the purpose of cashing out her remaining vacation time after she resigned.  Green Dep. 89:14–90:3; *see* Doc. 47-5.  Maldonado was issued a final paycheck on November 29, 2010, apparently to correct a payroll error made in September 2010.  *See* Doc. 47-5.

response to the lawsuit.  Green Dep. 227:20–229:5.  Additionally, he cannot recall if he took the allegations in the lawsuit seriously.  *Id.* at 279:4–18.

**B.     Procedural History**

On October 15, 2012, Maldonado filed the Complaint in this action against Green and "Alta HealthCare Group, Inc. d/b/a Aiden Springs Assisted Living," asserting the following claims:  (1) Count I – unpaid minimum wage under the FLSA; (2) Count II – recovery of overtime compensation under the FLSA; and (3) Count III – declaratory relief.  *See* Doc. 1.  In the Complaint, Maldonado essentially alleges that Defendants failed to properly compensate her for her night shifts as required under the FLSA.  *See id.*  The instant cross-motions for summary judgment followed.  *See* Docs. 46, 47.  In their Joint Final Pretrial Statement, however, the parties stipulated that they had agreed to dismissal of Maldonado's claim for unpaid minimum wages.  Doc. 70 at 1.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact.  *Id.* at 324.  Issues

of fact are genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.  A fact is "material" if it may affect the outcome of the suit under governing law. *Id.* at 248.  In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party.  *Id.* at 255.

## III.   DISCUSSION

Maldonado's claims arise under the overtime provision of the FLSA, 29 U.S.C. § 201 *et seq*.  The overtime provision states, in pertinent part:  "no employer shall employ any of his employees who in any workweek . . . is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  An action to enforce this provision must be brought within two years after the claim accrues, except that the statute of limitations is extended to three years for willful violations.  29 U.S.C. § 255(a).

In her Motion, Maldonado asks the Court to make the following findings on summary judgment:  (1) that Alta is an "enterprise" covered under the FLSA; (2) that Green is an individual employer under the FLSA; (3) that the Live-In Agreement is unreasonable as a matter of law, such that Defendants are liable to Maldonado for the hours she actually worked during her night shifts; and (4) that Defendants' failure to compensate Maldonado for work she performed during night shifts was a willful violation of the FLSA, such that the statute of

limitations is extended to three years.  *See* Doc. 47.  Maldonado only seeks summary judgment as to liability, and wishes to reserve the issue of the amount of uncompensated work time for determination by a jury.  *Id.* at 20 n.11.  Defendants, on the other hand, seek a summary judgment finding that Maldonado's unpaid overtime claim is barred by the two-year statute of limitations, and that extending the statute of limitations to three years is inappropriate because any violations were not willful.  *See* Doc. 46.

### A.     Is Alta an "Enterprise" Covered Under the FLSA?

Under the FLSA, an "enterprise engaged in commerce or in the production of goods for commerce" includes an enterprise that "is engaged in the operation of . . . an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution."  29 U.S.C. § 203(s)(1)(B).  Maldonado contends that she is entitled to a summary judgment finding that Alta is a covered enterprise under the FLSA because Alta operates ALFs that are primarily engaged in the care of elderly individuals who reside at the ALFs.  Doc. 47 at 11–13.  Indeed, Defendants concede that the ALFs are primarily engaged in providing services to elderly individuals who reside there.  SOF ¶ 5.  Moreover, it is clear that the services provided by the ALFs constitute "care", as the staff members assist the residents with bathing, dressing, hygiene, and self-administration of medication, perform housekeeping and laundry services, provide companionship, and prepare meals.  *Id.* ¶ 6; *see Marshall v. Sunshine & Leisure, Inc.*, 496 F. Supp. 354, 356–59 (M.D. Fla. 1980) (finding, as a matter of law, that an ALF was primarily engaged in the care of the elderly where employees assisted the residents with walking, bathing, and hygiene, provided housekeeping and laundry services, prepared food, and were available around-the-clock to assist residents with such personal needs in the middle of the night).

Defendants do not dispute the foregoing.  Rather, they assert that Maldonado named the wrong entity as a defendant in this action, because her Complaint identified the corporate defendant as "Alta HealthCare Group, Inc. d/b/a Aiden Springs Assisted Living," and that during the time period relevant to this lawsuit, she only worked at the Summit Care and Deerwood facilities rather than the Aiden Springs facility.  Doc. 53 at 7.  Defendants' argument is without merit.  It is undisputed that "Aiden Springs Assisted Living Facility", "Summit Care Assisted Living Facility", and "Alta Healthcare at Deerwood" are merely fictitious names, registered with the State of Florida, for ALFs that Alta has owned and operated.  *See* Green Dep. 8:12–9:3; Doc. 60-1.  In Florida, a "fictitious name" has no independent legal existence, and can only be sued through its owner.  *Osmo Tec SACV Co. v. Crane Envtl., Inc.*, 884 So. 2d 324, 327 (Fla. 2d Dist. Ct. App. 2004).  Here, Maldonado has sued Alta, despite the fact that a trailing "d/b/a Aiden Springs Assisted Living" appears in the party name in the Complaint.[10]

Defendants also appear to make the equally meritless argument that Alta is not a covered enterprise because it is not *itself* an ALF, but only operates ALFs.  Doc. 53 at 7.  However, it is this very fact that puts Alta within the ambit of § 203(s)(1)(B)—Alta is an enterprise that "is *engaged in the operation of* . . . *institution[s]* primarily engaged in the care of . . . the aged . . . who reside on the premises of such institution."  29 U.S.C. § 203(s)(1)(B) (emphasis added). Because Defendants have not raised a genuine issue of material fact as to whether Alta is a covered enterprise under the FLSA, summary judgment will be granted in favor of Maldonado on this issue.

---

[10] It is undisputed that the fictitious names for the relevant ALFs are Summit Care and Deerwood. The discovery in this case pertained to these facilities and the Joint Pretrial Statement refers to these facilities. For reasons unknown to the Court, Maldonado did not seek leave to amend her complaint to identify the correct fictitious names for the ALFs.  Should this case proceed to trial, in order to avoid confusing the jury, the Court will consider a motion to amend the complaint to conform to the evidence.

### B.     Is Green an Individual Employer Under the FLSA?

Under the FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).[11]  "[T]o be personally liable as an 'employer,' a corporate officer 'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee.'"  *Olivas v. A Little Havana Check Cash, Inc.*, 324 F. App'x 839, 845 (11th Cir. 2009) (quoting *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986)).  In determining whether a corporate officer is an "employer," courts in this Circuit "inquire[ ] as to whether the officer was involved in the compensation of employees, the hiring or firing of employees, or other matters in relation to an employee." *Id.* (internal citations and quotations omitted).

Here, Defendants have conceded that Green hired Maldonado, set her rate of pay and schedule, and had the authority to discipline her.  SOF ¶ 7.  Moreover, Defendants have admitted that Green regularly exercised the authority to hire and fire Alta's employees, determine work schedules, and control Alta's finances and operations.  Doc. 13 ¶ 7.  In fact, in their response to Maldonado's Motion, Defendants do not put forth any argument to the effect that Green was *not* an individual employer under the FLSA.  *See* Doc. 53.  Accordingly, Defendants have not raised a genuine issue of material fact as to whether Green is an individual employer under the FLSA, and summary judgment will be granted to Maldonado on this issue.

### C.     Does the Live-In Agreement Protect Defendants from Liability?

The Wage and Hour Division of the Department of Labor ("DOL") has issued interpretive rules regarding the compensation of workers for sleep time.  *See* 29 C.F.R. §§

---

[11] An "employee" is "any individual employed by an employer," and the term "employ" means to "suffer or permit to work."  29 U.S.C. §§ 203(e)(1) & (g).

785.21, 785.22, 785.23.[12]  For example, Section 785.21 provides that "[a]n employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy."  29 C.F.R. § 785.21.  Section 785.22, on the other hand, provides that "[w]here an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep."  29 C.F.R. § 785.22.  The parties, however, do not present argument as to the applicability of Sections 785.21 or 785.22.  Rather, Maldonado contends that the Live-In Agreement is unreasonable under Section 785.23.  Doc. 47 at 16–18.  That Section provides:

> An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises.  Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own.  It is, of course, difficult to determine the exact hours worked under these circumstances and any *reasonable* agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

29 C.F.R. § 785.23 (emphasis added).  The Wage and Hour Division has issued an enforcement policy interpreting this provision, which states that for an agreement to be reasonable, employees must be compensated for any actual interruptions in sleep and, moreover, no more than eight

---

[12] Sections 785.21, 785.22, and 785.23 (as well as the Wage and Hour Division enforcement policy discussed *infra*) are "interpretive rules" which merely state the Wage and Hour Division's position on sleep time issues, and therefore they do not have the force of law.  *Shannon v. Pleasant Valley Cmty. Living Arrangements, Inc.*, 82 F. Supp. 2d 426, 429 (W.D. Pa. 2000).  Nevertheless, the interpretive rules are still entitled to some level of deference, either "substantial deference" under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or, more likely, as "a body of experience and informed judgment to which courts and litigants may properly resort for guidance" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  *Shannon*, 82 F. Supp. 2d at 429.  The parties have not addressed this issue or challenged the interpretive rules, and, moreover, there is no reason for the Court to question their validity under either standard.  As such, the Court will apply the rules to the facts at hand.  *See id.*

hours of sleep time may be deducted for each 24-hour on-duty period.  *See* Hours Worked in Residential Care (Group Home) Establishments – Sleep Time and Related Issues – Enforcement Policy, 1988 WL 614199 (Dep't of Labor, Wage and Hour Div., June 30, 1988).  Maldonado contends that the Live-In Agreement fails to meet either requirement, and is therefore *per se* unreasonable.  Doc. 47 at 16–18.

Defendants do not dispute that they failed to pay Maldonado for actual work during night shifts or that they deducted more than eight hours for sleep time.  Rather, they appear to argue that the Live-In Agreement had an "implicit value" of $1,085, which they assert can be deducted from Maldonado's wages under the FLSA and corresponding DOL regulations.  Doc. 53 at 8.

Under the FLSA, a "'[w]age' paid to any employee includes the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."  29 U.S.C. § 203(m).  Accordingly, an employer may deduct from an employee's pay the reasonable cost of employer-provided housing, food, or other living benefits, even if that deduction results in the employee's cash pay falling below the statutory minimum.  *Caro-Galvan v. Curtis Richardson, Inc.,* 993 F.2d 1500, 1513 (11th Cir. 1993); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 473–74 (11th Cir. 1982).  Under FLSA regulations, however, reasonable cost may not exceed the employer's actual cost, and does not include a profit to the employer.  *Caro-Galvan*, 993 F.2d at 1513; 29 C.F.R. § 531.3(a) & (b).  "Reasonable cost" generally equals "the cost of operation and maintenance including adequate depreciation plus a reasonable allowance (not more than 5 1/2 percent) for interest on the depreciated amount of capital invested by the

employer." 29 C.F.R. § 531.3(c).[13]  The employer is responsible for maintaining and preserving

records substantiating that cost.  *Caro-Galvan*, 993 F.2d at 1513 (citing 29 C.F.R. § 516.27(a)).

 The plaintiff has the prima facie burden of showing "as a matter of just and reasonable

inference that the wages paid to him did not satisfy the requirements of the FLSA."  *Id.* (internal

citations and quotations omitted).  "Once the employee proves that the wages received were less

than the statutory minimum, the burden shifts to the employer to prove with proper records the

reasonable cost" of the items furnished.  *Id.* at 1514.  "An employer's unsubstantiated estimate of

his cost, where the employer has failed to comply with the recordkeeping provisions of the

FLSA, and where there has been no determination of reasonable cost by the Wage and Hour

Division does not satisfy the employer's burden of proving reasonable cost."  *Id.* (internal

citations and quotations omitted).

 Maldonado has satisfied her prima facie burden by introducing uncontroverted evidence

that, on several occasions, she performed work during night shifts, and that she was not

compensated for this work as required under the FLSA.  As such, the burden shifts to Defendants

to substantiate with proper records their calculation of the reasonable cost of living benefits

which they deducted from her pay.  Defendants have utterly failed to make this showing.

Indeed, Green conceded that he did not have contemporaneous documentation related to his

calculation of the $1,085 "implicit value" of the Live-In Care Staff position.  *See* Green Dep.

159:4–6, 159:17–21.  The only evidence offered by Defendants to prove the "reasonable cost" of

living benefits provided to Maldonado is a one-page, bare-bones document that breaks down the

$1,085 "implicit value" into line items for room, food, utilities (lights & water), cable, local

---

[13] Both the FLSA and its implementing regulations provide a mechanism for employers to
request a determination of reasonable cost by the Administrator of the Wage and Hour Division.
*See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.4(a).  However, Defendants did not request such a
determination in this case.  *See* Green Dep. 156:11–15.

phone, parking, storage, and laundry.  *See* Doc. 27-8 at 7.  This document does not provide *any* substantiation as to how Defendants determined the reasonable cost of each benefit, let alone the detailed justification required under 29 C.F.R. §§ 516.27(a) and 531.3(c).  Indeed, Green testified that the values had nothing to do with the actual cost of the benefits provided to Maldonado.  *See* Green Dep. 155:14–167:1.  As Defendants' estimate of the reasonable cost of living benefits provided to Maldonado is completely unsubstantiated, the Live-In Agreement's deduction of these benefits from Maldonado's pay is impermissible.  *See Caro-Galvan*, 993 F.2d at 1513. Accordingly, the Court finds that the Live-In Agreement is unreasonable as a matter of law, and Defendants could not rely on it in refusing to pay Maldonado for time actually worked during night shifts.

This is not the end of the inquiry, however.  Although the Court agrees that the Live-In Agreement is unreasonable as a matter of law, in order to succeed on her claim, Maldonado must still show a violation of the overtime provision of the FLSA.  To prove a violation, Maldonado must demonstrate that (1) she worked overtime without compensation and (2) Defendants knew or should have known of the overtime work.  *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314–15 (11th Cir. 2007).  As to the first prong, Maldonado offered substantial evidence, in the form of testimony, declarations, and contemporaneous records, that she performed work during her night shifts, and it is undisputed that she was not paid for this work.  Defendants, meanwhile, have failed to put forth any evidence to rebut Maldonado's assertions, and therefore they have failed to create a genuine issue of material fact as to this issue.  Contrary to Defendants' assertions, Maldonado is not required at this stage to prove the exact amount of time she spent performing overtime work.  Rather, she must only "'produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"  *Allen*,

495 F.3d at 1316 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Here, Maldonado has met this burden by providing documentation from the Resident Observation Logs showing work that she performed during night shifts.  As no genuine issue of material fact exists as to Maldonado's performance of overtime work, summary judgment in her favor is proper on this issue.

As to the second prong of her unpaid overtime claim, Maldonado must show that Defendants had actual or constructive knowledge of her overtime work.  *Id.* at 1318.  With respect to actual knowledge, Maldonado offered evidence that she called Green on several occasions to inform him of incidents arising during night shifts, and she claims that Green reported to the scene on some of these occasions.  Maldonado Dep. 83:3–86:22.  Green, however, denied receiving phone calls from Maldonado during any night shifts.  Green Dep. 109:7–110:12, 111:14–16.  Although Maldonado argues that, during his deposition, Green acknowledged the existence of reported night shift incidents in the Resident Observation Logs, his testimony only reveals that he learned about them *in preparation for his deposition*, not at the time they occurred.  *See* Green Dep. 44:18–45:7, 194:19–196:6.  Because credibility determinations are reserved for a jury, a genuine issue of material fact exists as to whether Defendants had actual knowledge of Maldonado's overtime work.  As such, summary judgment is inappropriate on this issue.

By contrast, the Court finds that Defendants had *constructive* knowledge of Maldonado's overtime work.  "An employer is said to have constructive knowledge of its employee's overtime work when it has reason to believe that its employee is working beyond his shift.  The employer's knowledge is measured in accordance with his duty … to inquire into the conditions prevailing in his business."  *Allen*, 495 F.3d at 1319 (internal citations and quotations omitted).

Thus, "if an employer had an opportunity to acquire knowledge of an employee's work by using reasonable diligence, then the employer can be charged with constructive knowledge." *Id.* at 1321.  Here, Defendants acknowledge that Maldonado placed notes in the Resident Observation Logs regarding incidents she was required to address during night shifts.  Defendants further acknowledge that they were required to keep the Resident Observation Logs under Florida law, and that the records were indeed maintained in the ordinary course of Defendants' business.  Accordingly, with reasonable diligence, Defendants could have discovered Maldonado's overtime work.  Instead, by failing to even look at the Resident Observation Logs, Green breached his duty to inquire into the conditions prevailing in his business.  Even more importantly, the *very reason* that Defendants employed the Live-In Care Staff, as stated in the Job Description, was to have someone available to assist residents during the night.  Under these circumstances, Defendants cannot simply plead ignorance as to actual work occurring during night shifts, and a finding of constructive knowledge, as a matter of law, is appropriate.  *See Reich v. Dep't of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1083 (11th Cir. 1994) (reversing district court and finding constructive knowledge as a matter of law where the employer failed to inquire into the conditions prevailing in his business).  Given this finding, Maldonado has successfully proven a violation of the overtime provision of the FLSA.

### D.    Are Maldonado's Claims Barred by the Statute of Limitations?

Finally, Defendants ask the Court to find that Maldonado's unpaid overtime claims are barred by the FLSA's two-year statute of limitations, and that there has been no showing of willfulness that would extend the statute of limitations to three years.  *See* Doc. 46.  Maldonado, on the other hand, asks the Court to find that Defendants' violations of the FLSA were willful as a matter of law, such that the statute of limitations is extended to three years.  *See* Doc. 47 at 21–23.

As an initial matter, the Court finds that at least three violations of the FLSA's overtime provision occurred within the two-year statute of limitations. The Eleventh Circuit has held that the FLSA is violated "each time the [employer] issue[s] [the] plaintiff a paycheck that fail[s] to include payment for overtime hours actually worked. . . . Each failure to pay overtime constitutes a new violation of the FLSA." *Knight v. Columbus, Ga.*, 19 F.3d 579, 581 (11th Cir. 1994) (internal citations omitted). "Because each violation gives rise to a new cause of action, each failure to pay overtime begins a new statute of limitations period as to that particular event." *Id.* at 1582. In this case, the last three regular paychecks delivered to Maldonado were issued on October 18, October 25, and November 8, 2010. *See* Doc. 47-5.[14] To the extent that these paychecks failed to include sufficient overtime pay, each paycheck was a separate violation of the FLSA and started a new limitations period. *See Knight*, 19 F.3d at 581–82. Maldonado filed the Complaint in this action on October 15, 2012, less than two years after these violations. *See* Doc. 1. Accordingly, Maldonado's claims with respect to these violations are not time-barred.[15] This conclusion alone means that Defendants' Motion must be denied.

With respect to claims arising more than two years before the commencement of this action, but less than three years before such date, Maldonado may recover if she can prove that Defendants' violations were willful. *See* 29 U.S.C. § 255(a). "To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that [her] employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-*

---

[14] Contrary to Defendants' argument, at no point in this litigation has Maldonado limited her claims to those arising during her time at the Summit Care facility. *See* Doc. 1 ¶ 19.

[15] The Court also notes that, to the extent the paychecks issued on November 1, 2010 and November 29, 2010 failed to include sufficient overtime pay, *see supra* n.9, those violations are actionable under the two-year statute of limitations.

*Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162–63 (11th Cir. 2008).  While the Eleventh Circuit has noted that it has never expressly held that willfulness in a FLSA case is a jury question, it has implied as much.  *Id.* at 1163 n.3 ("We have been unable to find an FLSA decision of this Court squarely holding that the decision about whether the employer acted willfully for purposes of determining the statute of limitations period is to be decided by the jury. In the district court, the court and the parties assumed that the jury was to decide willfulness, and the parties have assumed that in their briefs and arguments to us. So, we assume it too."). Moreover, numerous district courts in this Circuit have held that willfulness is properly decided by a jury where genuine issues of material fact exist, and the Eleventh Circuit Pattern Jury Instructions provide as much.  *See Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1265 (M.D. Ala. 2013); *Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1359 (S.D. Fla. 2010); *Reynolds v. City of Jacksonville*, No. 3:08-cv-388, 2009 WL 5067799, at *7–8 (M.D. Fla. Dec. 16, 2009); *McGuire v. Hillsborough Cnty., Fla.*, 511 F. Supp. 2d 1211, 1218 (M.D. Fla. 2007); Note II.B to Pattern Jury Instruction 4.14, Eleventh Circuit Pattern Jury Instructions (Civil), 2013 revision.

In this case, there is sufficient evidence for a reasonable jury to conclude that Defendants' violations of the FLSA were willful.  Green testified that he knew that the FLSA requires time-and-a-half compensation for hours over 40 per week.  In fact, Alta had been sued for FLSA violations in 2008, and Green was at least minimally involved in the resolution of that lawsuit.  However, Green could not recall whether Alta conducted an investigation or made any changes to its business in response to the lawsuit, nor could he recall if he took the allegations of that lawsuit seriously.  Additionally, there is disputed evidence regarding whether Defendants had actual knowledge of Maldonado's work during night shifts. The Court has already concluded

that Defendants had constructive knowledge of this work.  As such, a reasonable jury could conclude that Defendants knew that their failure to compensate Maldonado for night shift work was in violation of the FLSA or, alternatively, that Defendants showed a reckless disregard about whether they were violating the statute.  Given the disputed evidence, the Court cannot conclude, as a matter of law, that Defendants' conduct was willful. On the record before this Court, the issue of willfulness is a question for the jury.  Accordingly, Defendants' Motion and Maldonado's Motion will be denied on this issue.

## IV.   CONCLUSION

For the aforementioned reasons, the Court will deny Defendants' Motion, and grant in part and deny in part Maldonado's Motion.  This case will proceed to trial on the issues of the amount of uncompensated work time and corresponding damages, and whether Defendants' violations of the FLSA were willful.

Accordingly, it is hereby **ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 46) is **DENIED**.

2.    Maldonado's Motion for Partial Summary Judgment (Doc. 47) is **GRANTED in part and DENIED in part** as set forth in this Order.

**DONE** and **ORDERED** in Orlando, Florida on March 26, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties